IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| DAVID JON BROWN,<br><br>               Plaintiff,<br><br>vs.<br><br>SIGNAL PEAK ENERGY, LLC, and<br>JOHN DOES I-II,<br><br>               Defendants. | CV 20-180-BLG-SPW<br><br><br>ORDER GRANTING<br>SUMMARY JUDGMENT |

Plaintiff David Jon Brown filed this action against Signal Peak Energy, LLC ("Signal"), alleging wrongful discharge under Montana's Wrongful Discharge from Employment Act ("WDEA"). (Doc. 13). Signal now moves for summary judgment on Brown's wrongful discharge claim, which is his only outstanding claim. (Doc. 48). Brown also filed a motion to reopen discovery (Doc. 44) and motion for judicial notice (Doc. 46). The Court finds that summary judgment is proper because the undisputed facts demonstrate Signal had a legitimate business reason that was not pretextual to fire Brown. Accordingly, the Court grants Signal's motion on the merits, and denies Brown's motions as moot.

//

//

//

I.     **Statement of Facts**[1]

   A.     *Background*

Signal operates an underground coal mine near Roundup, Montana.  (Doc. 55 at 1).  Signal hired Brown on August 31, 2010, as a longwall coordinator.  (*Id.* at 3).  On November 20, 2013, Brown assumed the longwall planner position. (*Id.*).  As longwall planner, Brown had a variety of responsibilities related to the creation and implementation of the longwall mining production plan.[2]  (Doc. 50-9).  His responsibilities included,

- Planning, scheduling, coordinating, controlling, and helping supervise the activities of all longwall crew members;
- Establishing and being responsible for section safety and production goals;
- Interfacing with the Mine Manager, Maintenance Manager, Shift Foreman, Engineering, Safety, and Human Resources to assure compliance with all State and Federal regulatory requirements, as well as Company policies, guidelines and standards;
- Assuring that activities under his direct supervision are consistent with company policy and that a safe work environment exists;
- Establishing and maintaining good communications with production/downshift and maintenance departments to ensure safety and production goals are achieved; and
- Ensuring compliance with Mineral Safety & Health Administration (MSHA) regulations

(*Id.* at 1).

---

[1] The statement of facts is taken from the parties' filings and are undisputed unless otherwise indicated.

[2] Longwall mining is a form of underground coal mining in which a wall of coal is mined "in a single slice."  (Doc. 49 at 6).

The longwall planner job description does not list any employees whom the longwall planner specifically supervises. (*See id.*). During the relevant time that Brown worked as longwall planner, Brown reported to Dale Musgrave, the Vice President of Underground Operations. (Doc. 55 at 3-4). Brown testified that he also reported to Justin Cowger, who worked as the longwall coordinator, though he stated that only Musgrave had full authority over him. (*Id.* (citing Doc. 55-1 at 7)). Signal's Human Resource Director denied such a relationship between Brown and Cowger, and Musgrave did not mention Cowger as someone to whom Brown reported. (Doc. 50-2 at 3; Doc. 50-5 at 1-2).

Signal's employee handbook outlines company procedures, practices, policies, and benefits. (Doc. 50-11).[3] The handbook requires employees to immediately report "all injuries on the job, illnesses, and equipment damage" to their immediate supervisor. (*Id.* at 73). "No matter how minor an occupational injury appears to be, it is important that it be reported." (*Id.*). The supervisor then must immediately report the accident to Signal's Safety Department and complete an accident report form by the end of the shift. (*Id*). All incidents and accidents are investigated. (*Id.*). Failure to report "may result in disciplinary action, up to and including termination." (*Id.*).

---

[3] Signal attached as exhibits its 2020 and 2017 handbooks. Since Signal terminated Brown in 2019, the 2020 version of Signal's handbook (Doc. 50-12) would not apply to his claim. As such, the Court shall refer to the 2017 version of Signal's handbook (Doc. 50-11).

The handbook also provides a non-exhaustive list of performance standard violations that can result in disciplinary action and/or immediate discharge. The list includes:

- Unsatisfactory job performance
- Neglecting job duties and responsibilities
- Violating Company safety rules and policies, and/or MSHA regulations
- Violating any Signal policies, rules, regulations, or practices

(*Id.* at 39-40).

B.   *September 2019 Incident*

On September 16, 2019, Brown, Cowger, and Steve Campbell, the longwall maintenance manager, were working in the mine on a longwall face. (Doc. 55 at 10). Late that afternoon, coal suddenly fell off the longwall and buried Cowger at least up to his shoulder. (*Id.* at 10-11; Doc. 50-22 at 1). Brown was taking measurements under a piece of machinery called a shearer, so though he was protected from the impact from the coal fall, he was trapped. (Doc. 55 at 11). Campbell tried diving under the shearer for protection, but his legs were pinned under Cowger and the coal. (*Id.*).

Cowger told Brown that he could not get out on his own. (*Id.*). Since Brown was trapped underneath the shearer, he could not help Cowger or Campbell. (Doc. 50-7 at 12). Several crew members came over and began digging Cowger out. (*Id.*). One of the crewmembers, Travis Gollick, told another crewmember to call dispatch. (Doc. 55 at 12). Brown heard Gollick and said, "No, don't call

4

dispatch. Just get over here and start digging." (*Id.*). Brown testified that Cowger

had said not to call dispatch, and Brown deferred to Cowger because Cowger "was

the one that was covered up ... Nobody else really could see what was going on

yet." (Doc. 50-7 at 13). Cowger also testified that he was "having a real hard time

breathing" while buried. (Doc. 50-3 at 6).

The crewmembers were in danger of more coal falling on them during the

rescue, so after moving enough debris so that they could see Cowger,

crewmembers installed a Simplex jack on the wall to prevent additional debris fall.

(Doc. 55 at 14; Doc. 50-3 at 6). They then used hammers, screwdrivers, and

sledgehammers to break up the debris covering Cowger and Campbell into pieces

that were small enough to lift. (Doc. 55 at 13). The crewmembers eventually

extricated Cowger and Campbell. (Doc. 50-3 at 7). Brown dug himself out. (Doc.

50-7 at 12). The MSHA investigation later determined that conditions in the mine

were "highly likely" to result in injury and could reasonably be expected to be

fatal. (Doc. 55 at 14).

After Cowger was rescued, a crewmember helped Cowger to his truck

because he could not walk on his own. (Doc. 55 at 16). Brown then drove Cowger

in Cowger's truck out of the mine to the back entrance of the bathhouse. (*Id.*).

Brown maintains he did so because Cowger told him to, and it was closer to

Cowger's locker. (*Id.* at 44). Signal claims Brown took him to the back entrance

5

because he wanted to "save Cowger from 'embarrassment'"; as Brown testified, "when someone gets hurt, 'you're embarrassed because you're hurting your company ...[and] your peers.'" (*Id.* at 16-17). Had Brown and Cowger walked in through the front entrance, the dispatcher and foreman, whose offices are located at the front entrance, likely would have seen them. (*Id.* at 17).

Cowger was unable to put his full weight on his ankle, so Brown helped him walk from the truck to the bathhouse. (*Id.*). Brown said Cowger "winced with some pain" as they walked, though Cowger maintained he thought he only had a sprained ankle. (*Id.* at 17-18). Inside the bathhouse, Phil McPherson was getting ready to start his shift. (*Id.* at 18). McPherson later testified that Cowger "was in serious pain. He wasn't putting weight on his leg, and he was grunting a lot like a guy would who was hurt." (Doc. 50-20 at 2).

Cowger cut off his boot with a knife because he was in so much pain. (Doc. 55 at 18). McPherson described Cowger's leg and foot as "disfigured and purple and black." (*Id.* at 19). Cowger and Brown then left the bathhouse. (*Id.*). McPherson testified that, as Brown left, he told McPherson, "you didn't see us, keep your mouth shut." (*Id.* (citing Doc. 50-20 at 3)). Signal's internal investigation corroborated this statement. (*Id.* (citing Doc. 50-17 at 3; Doc. 50-16 at 8)). Brown denies he said this and does not remember seeing McPherson in the bathhouse. (Doc. 55-1 at 21). Cowger testified he heard McPherson and Brown

6

talking but did not hear what they said. (Doc. 55 at 19). McPherson immediately reported Cowger's injury and what he experienced in the bathhouse to his supervisor. (*Id.* at 20).

Brown drove Cowger home because Cowger felt "it's going to hurt when I push on my clutch on my little car." (Doc. 50-7 at 20). During the car ride home, Brown repeatedly asked Cowger if he was okay and wanted to go to the hospital. (Doc. 55 at 21). Cowger maintained that he was fine. (Doc. 50-7 at 20).

When Cowger arrived home, he called Musgrave "to find out how [Musgrave] wanted [Cowger] to report [his injury] or not report it." (Doc. 55 at 21). Cowger and Musgrave agreed Cowger would say he was injured at home in a four-wheeler accident. (Doc. 50-3 at 8). The parties disagree on Cowger's reasons for doing so. (*See* Doc. 55 at 22). Cowger then went to the hospital and learned that his leg was broken in four places and that he would need surgery. (*Id.*).

Musgrave told Brown the next morning that Cowger had gotten in an ATV accident. (*Id.*). Brown repeatedly told Musgrave that was incorrect, and that Musgrave needed to report the injury. (Doc. 50-7 at 23). However, Musgrave told Brown to stay quiet about the truth. (*Id.*). Brown testified that he knew Musgrave's decision was wrong and a violation of MSHA regulations. (*Id.*).

C.    *Incident Investigation*

MSHA received an anonymous report about Cowger's injury. (Doc. 55 at 23). On about September 23 or 24, Cowger returned to work and learned MSHA had opened an investigation into his accident. (*Id.*). Cowger then reported his injury to Signal. (*Id.*). Signal filed an incident report with MSHA but incorrectly stated that Cowger had taken off prescheduled vacation days following the injury, rather than reporting it as a lost time accident.[4] (*Id.* at 24). The parties dispute whether Cowger or Musgrave reported to Signal that the days Cowger took off were prescheduled vacation days, not lost time. (*Id.*).

Two and a half months later, Musgrave was fired for not reporting workplace injuries and charged criminally with possession and distribution of cocaine. (*Id.* at 24, 39). Brown temporarily filled Musgrave's position as Vice President of Underground Operations until Signal hired Parker Phipps as permanent Vice President of Underground Operations. (*Id.* at 25). Musgrave was one of a handful of Signal's former management team who were charged between 2013 and 2019 with various federal crimes, including wire fraud, money laundering, failure to report work injuries pursuant to MSHA laws, and other violations of environmental and safety laws. (*Id.* at 2, 39).

---

[4] A lost time accident is one in which an injured employee has to miss work for an injury and did not previously plan to take the missed days off.

Phipps heard rumors from other employees that Cowger's injury had not been reported to MSHA as a lost time accident and that Cowger initially said he was injured at home. (*Id.* at 25). Phipps then asked Phillip Stansell, Signal's Human Resources Director, and Curtis Floyd, Signal's Safety Director, to conduct an internal investigation. (*Id.*). Floyd and Stansell interviewed eight Signal employees and gave their interview notes to Phipps. (*Id.* at 25-29).

Phipps reviewed these notes, as well as Brown's personnel file, which contained documented disciplinary actions for incidents of bullying and other unprofessional behavior. (*Id.* at 29). Phipps determined that Brown: (1) knew or should have known that Cowger was injured; (2) stopped crewmembers from calling dispatch; (3) attempted to hide Cowger's injury by taking him through the backdoor of the bathhouse; and (4) attempted to hide Cowger's injury when he told McPherson to keep his mouth shut. (*Id.* at 30). Signal determined that these acts violated Signal's standards and policies. (Doc. 50-13 at 7; Doc. 55-2 at 10). Phipps then terminated Brown.

## II.   Legal Standard

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" only if there is a sufficient

evidentiary basis on which a reasonable fact finder could find for the nonmoving

party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is

"material" only if it could affect the outcome of the suit under the governing law.

*Id.*

The party seeking summary judgment bears the initial burden of establishing

the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. To meet

this burden, the movant must identify those portions of "'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of

material fact." *Id.* (citing Fed. R. Civ. P. 56(c)(1)(A)). If the moving party meets

its initial responsibility, the burden then shifts to the opposing party to establish

that a genuine issue as to any material fact actually exists. *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). When making this

determination, the Court must view all inferences drawn from the underlying facts

in the light most favorable to the non-moving party. *See id.* at 587.

## III.   Analysis

The WDEA provides the exclusive remedy for wrongful discharge from

employment in Montana. Mont. Code Ann. § 39-2-902. A discharge is wrongful

if it is: (1) in retaliation for the employee's refusal to violate public policy or for

reporting a violation of public policy; (2) not for good cause after the employee's

probationary period; or (3) the result of the employer violating its own written personnel policy. *Id.* § 39-2-904(1).

   *A. Good Cause*

     Under subsection (b), "good cause" is defined as "reasonable job-related grounds for dismissal based on failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason." *Id.* § 39-2-903(5). A legitimate business reason is one that is "neither false, whimsical, arbitrary or capricious," and has "some logical relationship to the needs of the business." *Becker v. Rosebud Operating Servs., Inc.*, 191 P.3d 435, 441 (Mont. 2008) (quoting *Kestell v. Heritage Health Care Corp.*, 858 P.2d 3, 7 (Mont. 1993)). Violation of company policies can constitute good cause. *See Fenger v. Flathead County*, 922 P.2d 1183, 1185-86 (Mont. 1996); *Golden v. Nw. Corp.*, 13 F. Supp. 3d 1052, 1057-59 (D. Mont. 2014).

     In considering whether a discharge was wrongful, "[a]n employer's legitimate right to exercise discretion over whom it will employ must be balanced … against the employee's equally legitimate right to secure employment. *Johnson v. Costco Wholesale*, 152 P.3d 727, 733 (Mont. 2007) (internal citation omitted). "The balance should favor an employee who presents evidence, and not mere speculation or denial, upon which a jury could determine that the reasons given for

his termination were false, arbitrary or capricious, and unrelated to the needs of the business." *Id.* (internal citation omitted).

Employers are afforded the "greatest discretion" when determining whether to terminate a managerial employee or an employee who occupies a "sensitive" managerial position and exercises "broad discretion." *Sullivan v. Cont'l Constr. of Mont., LLC*, 299 P.3d 832, 835 (Mont. 2013); *McConkey v. Flathead Elec. Co-op.*, 125 P.3d 1121, 1126 (Mont. 2005). The Montana Supreme Court granted employers such discretion to prevent courts from "becom[ing] involved in the day-to-day employment decisions of a business regarding its management." *McConkey*, 125 P.3d at 1126 (quoting *Buck v. Billings Mont. Chevrolet, Inc.*, 811 P.2d 537, 541 (Mont. 1991)).

An employee has the burden of proving their discharge was wrongful. *Becker*, 191 P.3d at 441. However, when the employer moves for summary judgment on a WDEA claim, it has the initial burden to establish that no issues of material fact as to good cause exist. *Smith v. Charter Comm'cns, Inc.*, CV 18-69-BLG-SPW, 2021 WL 236660, at *1 (D. Mont Jan. 25, 2021), *certifying question on other grounds to Montana Supreme Court*, 22 F.4th 1134 (9th Cir. 2022). If an employer establishes good cause, the employee may only defeat summary judgment if they can "prove that the given reason for the discharge is not 'good cause' in and of itself, or that the given reason 'is a pretext and not the honest

reason for the discharge.'" *Becker*, 191 P.3d at 441 (quoting *Johnson*, 152 P.3d at 734). The employee's evidence "must go beyond mere denial or speculation and show facts sufficient to allow a fact-finder to decide that the termination was not for good cause." *Charter Commc'ns*, 2021 WL 236660, at *2.

If an employee disputes the truth of certain factual assertions made by the employer, "such disputes do not render summary judgment inappropriate where there are facts *not* in dispute that provide 'good cause' for discharge from employment." *Davis v. Montana, Dept. of Public Health and Human Servs.*, 357 P.3d 320, 322 (Mont. 2015) (emphasis in original). For instance, in *Davis*, Davis disputed a variety of facts surrounding her termination. *Id.* However, Davis admitted that she repeatedly failed to report to work, refused to attend meetings arranged to discuss certain concerns she had, and, as a result, failed to satisfactorily perform her job duties and disrupted the operation of the employer's business. *Id.* at 322-23. Because these undisputed facts constituted good cause for discharge, summary judgment was proper, regardless of the other disputed facts. *Id.*

### 1. Signal Supplied Good Cause for Brown's Termination

Signal argues it had good cause to terminate Brown because the undisputed facts show that his conduct violated Signal's policies and procedures, federal law, and Signal's trust in him as a manager to ensure the safety of its workforce. (Doc. 49 at 14). Specifically, Signal points to Brown stopping crewmembers from

calling dispatch after the wall collapsed on top of Cowger and Campbell, failing to call dispatch to obtain medical assistance once it was clear that Cowger was injured, hiding Cowger's injury from mine personnel by bringing Cowger in through the back entrance of the bathhouse, and telling McPherson to "keep his mouth shut" about Cowger's injury. (Doc. 49 at 14-16). Brown's actions not only put crewmembers in an unsafe situation but also interfered with the workers' statutory right to report unsafe work conditions and injuries to Signal or MSHA. (*Id.*). Since safety is a legitimate business concern for an underground coal mine according to both federal law and Signal policy, Signal concludes that Brown's perpetuation of unsafe working conditions provided good cause to terminate him. (*Id.* at 14).

Brown contends that genuine disputes exist regarding the facts Signal asserts demonstrate good cause. First, whether Brown exercised poor judgment is disputed because the record contains conflicting accounts of why he told the crew not to call dispatch. (Doc. 54 at 21). Brown points to his testimony indicating that he could not see, and therefore assess, the situation because he was under the shearer and thus relied on Cowger's order not to call dispatch. (*Id.*). Brown also characterizes Cowger as Brown's supervisor, and whether it was reasonable to expect Brown to obey his supervisor is a fact question for the jury. (*Id.* at 19-20 (citing *Seypar, Inc. v. Water & Sewer Dist. No. 363*, 960 P.2d 311, 318-19 (Mont.

14

1998); *Dean v. Austin Mut. Ins. Co.*, 869 P.2d 256, 258 (Mont. 1994))). Signal's

attempts to cast Brown as Cowger's equal distort the reality that Brown was in a

"limited managerial position." (*Id.* at 27). Lastly, whether Brown's decision to not

call dispatch put the crew in danger is disputed because the crew put a Simplex

jack up while they were extracting Cowger to prevent additional debris from

falling. (*Id.* at 21). Overall, Signal is "looking at Mr. Brown's actions and

obviously it is easier to assess what sort of judgement [sic] he should have

exercised after the incident." (*Id.* at 22).

Second, Brown asserts that fact issues exist as to Brown's knowledge of

Cowger's injuries. Brown's understanding of Cowger's injuries was limited both

by the circumstances and the fact that Brown "is not a medical professional." (*Id.*

at 22-23 ("It was not Mr. Brown's job to poke and prod Cowger regarding the

severity of his injuries ....")). As for the situation at the bathhouse, factual

disputes exist as to whether Brown sought to conceal Cowger's injuries when he

drove Cowger to the back of the bathhouse and whether Brown told McPherson to

"keep his mouth shut." (*Id.* at 23-24).

In addition to these factual disputes, Brown argues that Brown's decisions

were driven by the "culture at Signal Peak, perpetuated by Signal Peak and its

upper management team, including Mr. Brown's supervisor, Musgrave, that

encouraged non-reporting" of accidents and injuries. (*Id.* at 25). Such a culture

15

instilled in employees a "mortal fear" of disobeying upper management. (*Id.* at 28-29). Thus, Brown's poor performance arguably was caused by Signal and precludes a finding of good cause. (*Id.*).

More broadly, Brown asserts that he was only in a limited managerial position, so Signal is not afforded as much discretion in terminating him. (*Id.* at 26-27). Brown cites to his testimony that he reported, in part, to Cowger as well as Musgrave and explains, without citation, that Brown was below other managers in the company hierarchy. (*Id.* at 8 (citing Doc. 55-1 at 7); Doc. 54 at 27). Signal disagrees, arguing that Brown held a sensitive managerial position that required him to exercise broad discretion, particularly with respect to safety. (Doc. 58 at 7).

As an initial matter, the Court agrees with Signal that Brown was in a sensitive managerial position and thus Signal had greater discretion in deciding whether to terminate him. As longwall planner, Brown was responsible for promoting, observing, and ensuring compliance with safety policies and MSHA laws. (Doc. 50-9 at 1). Brown also planned, scheduled, coordinated, controlled, and helped supervise the activities of all longwall crew members. (*Id.*). Furthermore, according to Gollick, "As a manager, Brown could still give me directions or instructions even though he was not my direct supervisor. In my experience working with Brown, if Brown told you to do something, then you better do it." (Doc. 50-10 at 2). Brown even admitted at one point to considering

16

himself a manager. (Doc. 55-1 at 18 ("That's where we go every day after we exit the mine, as managers. The upstairs of that building is the managers' office.").

Considering this overwhelming evidence demonstrating that Brown held a sensitive managerial position, Brown's argument does not create a genuine dispute. *Davis*, 357 P.3d at 322. Because Brown is a sensitive managerial employee, Signal had even greater discretion in deciding to terminate Brown than it would have with a lower-level employee. *Reinlasoder v. City of Colstrip*, 376 P.3d 110, 113 (Mont. 2015); *Sullivan*, 299 P.3d at 835.

Considering this greater discretion, the Court finds the undisputed facts demonstrate Signal had good cause to terminate Brown because Brown prevented crewmembers from calling dispatch and never reported Cowger's injury, contrary to Signal's policies and procedures, federal law, and his job duties. Generally, Signal has a legitimate business interest in ensuring workplace safety, particularly given the inherent dangers of underground mining. *See, e.g.*, 30 U.S.C. § 801(c) (2023) (defining purpose of Mining Safety and Health Act as improving working conditions and practices to prevent death and serious bodily injury). Calling dispatch in the case of an injury furthers that goal because dispatch is responsible for calling an ambulance, providing first-aid, reporting the injury, and initiating rescue procedures. (*See* Doc. 50-5 at 2). Since Brown is specifically responsible for promoting and ensuring compliance with safety and security procedures,

obstruction of the calling of dispatch is a dereliction of Brown's responsibilities. (Doc. 50-9 at 1-2). The installation of the Simplex jack does not support Brown's claim, since the record does not indicate that he ordered crewmembers to put the Simplex jack in place or that the Simplex jack ameliorated all safety hazards.

Furthermore, "[i]t is standard procedure [at Signal] to notify dispatch of any injury, potential injury, or situation that is not under control that could result in injury, so that dispatch can get help on the way." (Doc. 50-5 at 2; Doc. 50-10 at 2; Doc. 50-14 at 2 (declarations of Stansell, Gollick, and Campbell)). This procedure is reinforced at Signal's annual refresher training, which Brown attended every year of his employment. (Doc. 50-14 at 2; Doc. 50-15). Brown admitted to understanding that there was, at minimum, a potential for injury, saying that he was "sure [Cowger] had some distress. He had coal all piled on top of him." (Doc. 50-7 at 13). Therefore, company policy and Brown's training required dispatch to be called. Brown's interference with the call to dispatch violated this policy and therefore establishes good cause for his termination. *Fenger*, 922 P.2d at 1185-86; *Golden*, 13 F. Supp. 3d at 1057-59.

As to Brown's argument that he prevented crewmembers from calling dispatch because Cowger was his supervisor and Signal had a culture that encouraged non-reporting of accidents, Brown did not cite to, nor could the Court find, anything in the record that demonstrates Brown stopped the call to dispatch

18

for either of these reasons. *Johnson*, 152 P.3d at 733. These facts therefore do not create a genuine dispute over the reason behind Brown's decision and cannot preclude a finding of good cause.[5]

Brown's failure to report Cowger's injury also gave Signal good cause to terminate him because not reporting a workplace injury violates Signal's policies and federal law. *Fenger*, 922 P.2d at 1185-86; *Golden*, 13 F. Supp. 3d at 1057-59. Signal's policies require all occupational injuries "[n]o matter how minor" to be reported "immediately." (Doc. 50-11 at 73). MSHA law and regulations also require immediate notification to MSHA of any occupational injury so MSHA can determine if it needs to be investigated. 30 U.S.C. § 813(j); 30 C.F.R. pt. 50 (2022).

Brown's limited understanding of Cowger's injuries and their severity is immaterial because Signal's policy requires *all* occupational injuries to be reported. If Cowger was hurt in any way, Brown needed to report that injury. It is undisputed that Cowger was injured, and that Brown knew as much, so he had a duty to report the injury. (Doc. 55 at 16-17 (stating Brown observed that Cowger could not walk on his own and was wincing in pain while walking)).

---

[5] Signal contends that Brown's evidence supporting a culture of non-reporting is inadmissible hearsay. (Doc. 58 at 11-12). The Court does not need to resolve this argument, since whether the culture of non-reporting impacted Brown's decision is not genuinely disputed.

Despite blaming Signal's alleged culture of non-reporting for his decision to not report Cowger's injury, Brown again does not cite to, nor can the Court find, support in the record demonstrating as much. *Johnson*, 152 P.3d at 733. The record shows Musgrave came into Brown's office to ensure Brown perpetuated the lie that Cowger got in an ATV accident, but Brown never testified that his conversation with Musgrave caused him not to report the accident. (*See* Doc. 50-7 at 22-23 (describing Musgrave's threat that Brown would lose his job if he reported)). Rather, the parties agree that Brown did not report the injury to MSHA because "he believed 'it wasn't [his] responsibility to contact MSHA.'" (Doc. 55 at 23 (citing Doc. 50-7 at 24)). Brown maintained this belief despite his responsibility as longwall planner to ensure compliance with MSHA regulations, his general responsibility as a Signal employee to report injuries, and his ability to report anonymously, as another employee did. (Doc. 50-9 at 1; Doc. 50-20 at 3; Doc. 50-13 at 7 ("Whether you're a CEO or whether you're a brand-new hourly hand, the procedure doesn't change on how you report injuries.")).

The undisputed facts showing Brown (1) instructed crewmembers to not call dispatch despite having authority over them and Signal's policy requiring dispatch to be called, and (2) failed to ever report the incident to Signal or MSHA, are sufficient to constitute good cause for termination. Brown's actions are in direct contravention of Signal policy, Brown's training, and federal law, as well as

Brown's general responsibility to ensure workplace safety. Thus, the Court does not need to address whether Brown's actual reasons for bringing Cowger to the back entrance of the bathhouse and whether Brown told McPherson to "keep his mouth shut" are in dispute. *Davis*, 357 P.3d at 322. Even accepting Brown's account of those facts, their truth does not undermine the good cause stemming from Brown's obstruction of the crew calling dispatch and failure to report. Accordingly, Signal demonstrated good cause for terminating Brown.

### 2.    *Brown Provides No Evidence of Pretext*

Because the undisputed facts show Signal had good cause to terminate Brown, the Court must determine whether Signal's proffered reasons for discharge are pretextual. Brown argues Signal terminated Brown because of Musgrave's unlawful conduct, and that Phipps sought to rid the mine of any person who worked at Signal when the culture of non-reporting existed. (Doc. 54 at 31-32). However, Brown does not cite to evidence in the record to support these contentions and thus fails to meet his burden on summary judgment. *Charter Comm'cns*, 2021 WL 236660 at *2.

Additionally, even assuming Phipps intended to replace those managerial employees who worked at Signal when the culture of non-reporting existed, such a rationale for termination constitutes a legitimate business reason, and thus good cause, under *Buck*. 811 P.2d 537. In *Buck*, the new owners of the car dealership

where the plaintiff worked had good cause to terminate the plaintiff because they sought to place their own "long term faithful employees" in the plaintiff's managerial position. *Id.* at 540. "It would be against common sense and rationality for this Court to hold that such reasons or grounds do not constitute a legitimate business reason and are not related to the job involved." *Id.* at 541.

Accordingly, the record does not demonstrate that Signal had a pretextual reason for terminating Brown.

### B.   *Signal Did Not Violate Its Personnel Policy*

Brown lastly argues his discharge was wrongful because his termination violated Signal's policies. (Doc. 54 at 32 (citing Mont. Code Ann § 39-2-904(1)(c)). However, Brown does not specify which personnel policies Signal violated. Instead, Brown merely states, without support, that he was terminated for the unlawful conduct of Musgrave. (*Id.* at 32-33). Given Brown's complete lack of development of this argument, denial of summary judgment on this ground given Signal's showing of good cause is inappropriate.

## IV.   Conclusion

For the above reasons, the Court finds that Signal had good cause to terminate Brown because he prevented crewmembers from calling dispatch after the longwall collapsed and failed to report Cowger's injury, despite his duty to do so as longwall planner and in violation of Signal's policies and federal law.

IT IS HEREBY ORDERED that Defendant Signal Peak Energy, LLC's Motion for Summary Judgment (Doc. 48) is GRANTED.  IT IS FURTHER ORDERED that Plaintiff David Jon Brown's Motion to Reopen Discovery (Doc. 44) and Motion for His Request for Judicial Notice (Doc. 46) are DENIED as moot.  The clerk is ordered to enter judgment and close the case.

DATED this _31st_ day of May, 2023.

SUSAN P. WATTERS
United States District Judge